**Jack MA, a subject of the Republic of China, Plaintiff-Appellant,**

v.

**The COMMUNITY BANK, a Wisconsin banking corporation, Defendant-Appellee.**

**No. 80–2806.**

United States Court of Appeals, Seventh Circuit.

Argued March 2, 1982.
Decided June 8, 1982.*

---

* This appeal was originally decided by unreported order on June 8, 1982. See Circuit Rule 35.

The Court has subsequently decided to issue the decision as an opinion.

Jack Ma, pro se.

Robert C. Burrell, Borgelt, Powell, Peterson & Frauen, S. C., Milwaukee, Wis., for defendant-appellee.

Before BAUER, CUDAHY and POSNER, Circuit Judges.

CUDAHY, Circuit Judge.

At its inception, this diversity case involved a relatively uncomplicated dispute. The plaintiff, Jack Ma, owned three Savings Certificates of Deposit ("SCD's") in the amount of $10,000.00 each, which were stolen from him on September 27, 1971. The defendant bank, issuer of the SCD's, refused to issue new certificates to Ma unless he agreed to execute a Bond of Indemnity, which would cost him $600.00. Ma refused to purchase the bond, primarily because before he had purchased any SCD's from the bank, he had been assured by an officer of

the bank that if the certificates were ever lost or stolen, he need only notify the bank and new certificates would be issued to him immediately. Because Ma refused to buy the bond, the bank refused to issue replacement certificates, refused to release the principal, and withheld some (though not all) interest on the principal. The result of this dispute is the instant lawsuit, which is now in its ninth year.

In March 1967, Ma came to the United States [1] to pursue an education, enrolling at St. Norbert's College in DePere, Wisconsin. He opened a passbook savings account at the defendant bank, through Gerald Gerbers, then the head teller at the bank. Ma asked Gerbers about time deposits, and Gerbers informed Ma that the bank offered SCD's, which carried higher interest rates than passbook savings accounts, with penalties for early withdrawal. Ma specifically inquired about the "safety" of an SCD in the event his certificate was lost or stolen. Gerbers assured him that the SCD was safe because it was not negotiable, and that if his certificate were ever lost or stolen he need only notify the bank, and a replacement certificate would be issued to him. Satisfied, Ma purchased an SCD in the amount of $4,000.00.

Ma stayed in DePere for one and one-half years. During that time he regularly transacted business at the bank, often with Gerbers, making deposits into and withdrawals from his savings account, and purchasing additional SCD's. In September 1968, Ma moved to California, but continued to do business with the bank through the mail. He cashed SCD's when they matured, purchased new ones, and received regular interest checks from the bank. In September 1971, Ma moved to New York, where his SCD certificates were stolen shortly after his move. Each SCD was in the amount of

$10,000.00, each was payable to Jack Ma, and each stated it was non-negotiable.

Ma immediately notified the bank by telephone of the theft, and later wrote to the bank, notifying it of his loss and his new address, and requesting that his interest checks and new certificates be sent to him. In response, the bank informed Ma that it would send him replacement certificates and his periodic interest checks only if he purchased an indemnity bond in the amount of $50,000.00. Ma discovered, however, that no bonding company in New York would sell him a bond because he was a foreign student without assets in this country. He so informed the bank, and offered to travel to Wisconsin if necessary to obtain new certificates. The bank made no response to this offer. Instead, in February 1972, the bank notified Ma that it had found a bonding company in Wisconsin willing to sell him the required bond for $600.00, and persisted in its request that Ma purchase the bond. Unwilling to purchase the bond, Ma sought advice from various people, including a law professor at New York University Law School, his former physics professor at St. Norbert's College in DePere, attorneys in Milwaukee and Green Bay, an Assistant Regional Director of the FDIC, and numerous public officials. He was consistently advised to take legal action against the bank.[2]

During this period, the bank sent Ma periodic interest checks due on the SCD's even though Ma refused to purchase the bond of indemnity. However, the bank withheld eighteen interest checks until May 1973. When he received the checks, he had difficulty depositing some or all of them into his New York bank account because they were so out of date by the time he received them.

1. Ma was at that time a citizen of the Republic of China. He has since become a naturalized citizen of the United States.

2. Apparently, one of the lawyers he contacted, who practiced in Green Bay, entered into negotiations with the bank and came up with a solution whereby the bank would keep $750 in interest due to Ma, use that money to pay for the bond, release the principal to Ma, and at some later date return $300, part of the cost of the bond, to Ma. It is not clear why $750 was to be retained though the bond cost only $600. In any event, Ma found this solution unacceptable, and nothing more was done by the Green Bay lawyer.

Ma filed this lawsuit on August 10, 1973.[3] His amended complaint recited his purchase and the subsequent theft of the SCD's, and alleged seven "causes of action": (1) The bank refused to return the $30,000 to him or to reissue the certificates, despite his demand. (2) When the bank sent him the withheld interest checks in May 1973, it refused to pay compound rather than simple interest. (3) Ma was humiliated and embarrassed because of the difficulties he experienced in depositing the overdue interest checks. (4) As for the interest checks that were sent to Ma in timely fashion, the bank should have paid compound rather than simple interest rates. (5) The bank knew Ma as one of its customers and had told him that if his certificates were lost or stolen they would be replaced immediately, but later fraudulently denied knowing him and made unreasonable and unlawful demands on him to prevent him from recovering his $30,000. (6) The bank intentionally withheld Ma's money and refused to pay proper interest on it, with the result that Ma was harmed in his living style and suffered loss of business opportunities, and the bank knew or should have known this result would follow from its action. (7) The bank wrongfully converted Ma's $30,000.00 to its own use.

The bank's defense was, in essence, that its insistence on an indemnity bond was proper because of an identification problem. The bank contended it had no way of knowing that the Jack Ma who had requested new certificates was the same Jack Ma who owned the SCD's. The bank also maintained that because the SCD's were automatically renewable if not cashed upon maturity, the only interest due was that stated in the SCD's: simple interest at 5% per year, payable quarterly.

On January 15 and 16, 1976, Ma was deposed by the bank's attorneys and several bank employees were deposed by Ma's attorney. One of the employees testified she recognized Ma as a customer of the bank. Nonetheless, the bank continued to deny that it could be sure Ma was the owner of the SCD's. The district court, finding the bank employee's recognition of Ma dispositive, entered an order granting summary judgment in Ma's favor on the issue of his entitlement to the $30,000.00. On February 13, 1976, the court ordered the bank to turn over $29,025.22 to Ma.[4]

On October 21, 1977 (after numerous disputes, most of which concerned discovery matters and are not pertinent here), the district court entered an order disposing of four of Ma's causes of action. With respect to the first cause of action, although Ma's demand for return of the $30,000.00 was moot, in light of the summary judgment granted on February 13, 1976, the court held that a claim was stated, in that if the bank had agreed not to require a bond of indemnity when Ma bought the SCD's, its later insistence on the bond would amount to a breach of contract. The breach of contract claim was reserved for trial. The court read the second cause of action as a claim for interest on the withheld interest checks and concluded that if the checks were wrongfully withheld, the bank should pay interest on them. Accordingly, this claim was also reserved for trial. The court granted summary judgment for the bank on Ma's third cause of action, his claim of humiliation when he tried to deposit the untimely-paid interest checks.[5] The court held, first, that the bank did not cause any humiliation Ma may have suffered because Ma could see the dates that appeared on the

---

**3.** The case was originally assigned to Judge Myron L. Gordon. In January 1977, Ma moved for Judge Gordon's recusal, contending the judge was biased against him. The case was then assigned to Judge Robert W. Warren.

**4.** The district court ordered that $974.78 be withheld from the $30,000.00 to pay Ma's original attorney in the lawsuit who had obtained a judgment against Ma for attorneys' fees and

had brought garnishment proceedings against the bank to satisfy the judgment.

**5.** Although the district court purported to dismiss this claim, we construe the dismissal as a grant of summary judgment because the court relied on deposition testimony. Fed.R.Civ.P. 12(c).

checks.[6] Moreover, the court found that Ma was in fact permitted to deposit the checks into his New York account, upon condition that he allow time for them to clear before making withdrawals. The court found this arrangement insufficiently humiliating to support a claim for damages. The district court also granted summary judgment to the bank on Ma's fourth cause of action, his claim that he should have been paid compound interest on the wrongfully withheld $30,000.00. The court held that because the SCD's provided for automatic renewal at the same interest rate, no compound interest was due. The court found that the fifth cause of action stated a claim that the bank fraudulently induced Ma to purchase the SCD's by assuring him that if they were lost or stolen they would be reissued immediately, without telling him a bond would be required. This claim was accordingly reserved for trial. The court regarded Ma's sixth and seventh causes of action as a single charge of conversion, and dismissed them because the claim of conversion was no different from the breach of contract claim. Finally, the court addressed Ma's demand for punitive damages and for damages for lost business opportunities, holding neither type of damages recoverable. Punitive damages are not recoverable for mere breach of contract, the court held. Moreover, while agreeing that a breach of contract may amount to a tort, and that punitive damages might be recoverable for some torts, the court found that "[t]he facts of this case do not show the requisite conduct necessary to sustain the award of punitive damages." Regarding Ma's claim of lost business opportunities, the court denied such damages because they were speculative, because they were not within the contemplation of the parties, and because Ma did not exercise ordinary diligence in minimizing his losses.

Two other pretrial matters are pertinent to this appeal. The first is Ma's request for trial by jury, filed on January 28, 1976. The district court refused to allow a jury trial because the demand was not timely. Ma filed subsequent motions requesting jury trial, and they were similarly denied. Secondly, on July 14, 1976, the bank moved for an order requiring Ma to retain local counsel, relying on the district court's Local Rule 2.04. The bank argued that local counsel was necessary because of communication difficulties with Ma's New York attorney. Ma opposed this motion, arguing that communication problems had been minimal and would not be alleviated by his retention of local counsel because he intended his New York attorney to continue to have full responsibility for the case. Ma urged that the bank's motion to force him to hire—and pay—local counsel amounted to harassment and was an attempt to force Ma to drop the suit by making it too costly for him to continue. On July 29, 1976, the district court, stating that it had read the parties' arguments and was "amply advised in the premises," ordered Ma to obtain local counsel. Ma's interlocutory appeal to this court was dismissed in *Ma v. Community Bank*, 544 F.2d 522 (7th Cir. 1976) (unpublished order). Ma's local counsel filed an appearance on September 22, 1976.

Trial on Ma's three remaining claims (breach of contract, interest on interest, and fraudulent inducement) began on July 9, 1979 and was concluded on July 13, 1979. At the conclusion of the trial it was agreed that the parties would attempt to stipulate to the amount of damages due in the event the bank was found liable to Ma. In February 1980, Ma's New York and local counsel withdrew from the case and Ma was permitted to proceed *pro se*. On July 25, 1980, the district court filed its memorandum and order holding the bank liable to Ma on all three of his claims. Because the parties had not agreed on damages, the court ordered that a damages hearing would be necessary. 494 F.Supp. 252. This hearing was held November 5, 1980. On November 23, 1980, the district court awarded damages of $84.29 to Ma. This amount repre-

---

**6.** We take it from the lower court's memorandum that it felt Ma knew or should have known he would have trouble negotiating the checks because of their date and that he brought the embarrassment upon himself in attempting to negotiate them despite their date.

sented interest at 5% per year on the withheld interest checks. The court held that Ma was not entitled to any other damages.[7]

Ma appealed to this court. In his appeal, he raises eight issues for review. His primary concern is the damages to which he is entitled. We address the damages issues first.

### I. *Damages*

The damages Ma sought were: (1) return of his $30,000.00; (2) interest on the wrongfully withheld $30,000.00 and on the eighteen interest checks that were wrongfully withheld between October 1971 and May 1973; (3) attorneys' fees and litigation costs; (4) punitive damages; and (5) "consequential" damages for emotional distress, loss of business opportunities, injury to reputation, injury to professional career, and loss of living comfort and ease.

Ma was awarded the return of his $30,000.00. The bank had paid interest to him, during the years it withheld the principal, at the rate of 5% per year, not compounded, and the court refused to award interest on the principal over and above that amount. The court did award 5% per year simple interest, however, on the eighteen interest payments the bank had withheld. Ma introduced in evidence the attorneys' fees and litigation costs he had incurred, but he was not awarded these damages. He introduced considerable evidence of the bank's bad faith and unreasonableness in support of his quest for punitive damages, but he was not awarded such damages either.[8] Finally, he was not permitted to introduce evidence of his consequential damages and was not awarded such damages.

Ma objects to the damages award he received, contending, first, that he should have received more than 5% simple annual

interest both on the withheld principal and on the withheld interest checks.[9] He also contends that he should have been awarded attorneys' fees, litigation expenses, and punitive damages. Finally, he contends he should have been permitted to demonstrate consequential harm (emotional distress, injury to reputation, etc.) and should have been awarded damages for such harm.

### A. *Interest*

(1) *Prejudgment Interest.* The district court held that Ma was entitled to prejudgment interest on the money the bank withheld from him. Under Wisconsin law, prejudgment interest is due on a breach of contract claim where the amount claimed by the plaintiff is a sum certain. *E.g., Murray v. Holiday Rambler, Inc.,* 83 Wis.2d 406, 438, 265 N.W.2d 513 (1978). Prejudgment interest is calculated at the "legal" rate unless there is a specific contractual rate, in which case the contract rate applies. *Id.* at 438–39, 265 N.W.2d 513. In this case, the interest rate specified by the contract happens to be the same as the legal rate: 5% per year, not compounded. Wis.Stat. Ann. § 138.04 (1973). As noted above, the lower court found that the bank owed no interest to Ma on the $30,000.00 principal because during the time the bank withheld the principal, it paid Ma 5% simple interest on the principal. However, because some of the interest payments were unjustifiably delayed, the court held that the bank owed Ma interest at the contract rate of 5% not compounded on the delayed interest payments.

█ If Ma simply claimed entitlement to prejudgment interest, we would agree with the lower court's conclusion. However, Ma

---

7. The court did, however, award costs to Ma, as provided by statute.

8. As a sanction for failure to cooperate in discovery, the court prohibited Ma from introducing expert testimony on the reasonableness, as measured by banking industry practice, of the bank's actions. *See* Fed.R.Civ.P. 37(b)(2)(B). Ma does not argue that this sanction was unwarranted. Other evidence of bad faith was admitted.

9. The bank asserts that with regard to interest Ma seeks only a higher rate on the withheld interest checks. A fair reading of his brief, however, shows that he seeks a higher rate on both the principal and the interest. *See* Brief of Appellant at 18–20. *Cf. Haines v. Kerner,* 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (courts should construe *pro se* litigants' pleadings liberally).

claims entitlement to a higher rate of interest, on the basis of two other theories. First, he claims interest as a measure of the bank's unjust enrichment. Second, he claims interest as a measure of the consequential damages he suffered. We turn now to these arguments.

(2) *Interest as a Measure of Consequential Damages.* In Wisconsin, "[a]n award of damages for breach of contract should compensate the injured party for losses necessarily flowing from the breach." *Repinski v. Clintonville Federal Savings & Loan Assoc.*, 49 Wis.2d 53, 58, 181 N.W.2d 351 (1970); *accord, e.g., Sporleder v. Gonis*, 68 Wis.2d 554, 559, 229 N.W.2d 602 (1978). The amount of such losses, however, must be proved with reasonable certainty. Although mathematical precision is not required, the plaintiff must introduce evidence in the record that is "sufficient to enable a court or jury to make a fair and reasonable approximation" of the losses sustained as a result of the defendant's breach. *Metropolitan Sewerage Commission v. R. W. Construction, Inc.*, 78 Wis.2d 451, 469, 255 N.W.2d 293 (1977). Thus, for example, in *Plywood Oshkosh v. Van's Realty & Construction*, 80 Wis.2d 26, 257 N.W.2d 847 (1977), the court denied recovery of approximated losses because available evidence, which would have shown the amount of loss with greater precision, was not introduced.[10] Applying these principles to the present case, Ma was entitled to recover a rate of interest higher than 5% per year not compounded if: (1) he demonstrated that he was prevented from realizing such higher rate as the result of the bank's breach of contract, and (2) he demonstrated, with reasonable certainty, the amount of interest he was prevented from realizing. We hold that Ma succeeded in making both demonstrations, and that the district court erred in failing to award him a higher rate of interest.

At trial, Ma introduced evidence, which the bank has not attempted to contradict,

that on July 1, 1973, the bank began paying interest on SCD's at a rate of 5.5% per year, compounded daily. To take advantage of this higher rate, customers of the bank who held 5% SCD's were required to exchange their old certificates for new ones reflecting the higher rate. Ma was unable to exchange his certificates because they had been stolen, and the bank refused to issue replacements. It is established that the bank's refusal to issue replacement certificates was in breach of contract. It cannot be disputed that a direct result of the breach was that Ma was unable to realize the higher interest rate paid by the bank on SCD's after July 1, 1973. And the amount of interest thus lost was established with certainty by uncontradicted evidence.

■ The defendant appears to suggest that Ma is entitled to no consequential damages because he failed to minimize them. We disagree. It is true that "a plaintiff must do all that is reasonable to minimize damages," *Sprecher v. Weston's Bar, Inc.*, 78 Wis.2d 26, 253 N.W.2d 493, 500 (1977). But the bank's apparent belief that Ma should have minimized his damages by acquiescing in the bank's demand that he purchase the indemnity bond is erroneous. A similar argument was rejected by the Wisconsin Supreme Court in *O'Brien v. Isaacs*, 17 Wis.2d 261, 116 N.W.2d 246 (1962). In *O'Brien*, plaintiff was forced to leave his car in defendant's parking lot overnight, through the fault of the defendant. The following day, defendant refused to release plaintiff's car unless plaintiff paid him $1.00 for overnight parking. Plaintiff refused, and instead recovered the car by means of a replevin action. He then sued the defendant for $41.00, the cost he incurred in renting a car for three days until his own car was replevied. The Wisconsin Supreme Court rejected defendant's argument that plaintiff should have avoided this expense by paying defendant the $1.00 parking fee. The Court stated:

---

**10.** Compare *Cutler Cranberry Co. v. Oakdale Electric Cooperative*, 78 Wis.2d 222, 254 N.W.2d 234 (1977) (recovery of approximated losses permitted where loss resulted from damage to growing crops; evidence of crop yields from prior years was a sufficient basis from which to estimate the loss, and more precise proof of loss was impossible).

Defendant does not contend that $41 is an unreasonable amount for plaintiff's time loss, and for the value of the use of the car over the weekend. Defendant's contention, in essence, is that plaintiff should have paid him a dollar to prevent him from committing a tort. Although the great mass of mankind may have chosen to pursue this course in retrieving the automobile, we cannot say that the law so requires. To so hold would be to require submission to demands which in some instances might be extortionary. *Id.* at 267, 116 N.W.2d 246. In the present case, Ma took numerous steps to retrieve his funds from the bank, including offering to travel from New York to DePere to prove his identity. The bank chose to ignore this offer, and steadfastly insisted, even after a bank employee identified Ma, that it could not release his money because it could not identify him. In light of *O'Brien*, we cannot say that, in addition to Ma's other efforts to recover his money, he was required to submit to the bank's unfounded demand that he purchase an indemnity bond for the bank's protection before he could recover his funds.

■ Accordingly, we conclude that Ma is entitled to recover interest on $30,000.00 at the rate of 5.5% per year, compounded daily, for the period beginning July 1, 1973 and continuing until the date the bank returned Ma's money to him.[11] Naturally, this amount should be offset by the amount the bank paid to Ma as interest on the principal after July 1, 1973.

(3) *Interest as a Measure of Unjust Enrichment.* In *Kilgust Heating v. Kemp*, 70 Wis.2d 544, 235 N.W.2d 292 (1975), the Wisconsin Supreme Court recognized that interest may be awarded as a measure of the wrongful benefit realized by the defendant. But the court made clear that the amount of such wrongful benefit must be proved. *Id.* at 550, 235 N.W.2d 292. Ma contends that he is entitled to recover whatever profit the bank realized while it withheld his money.

We do not doubt that the bank realized a comfortable profit during the years it wrongfully retained Ma's money while paying him 5% simple interest. But Ma introduced no evidence to establish the amount of the bank's profit. The record does not reveal, and Ma does not suggest, that he was prevented from discovering such evidence or from introducing it at trial. We conclude that because Ma failed to prove the amount of the bank's "wrongful benefit," the trial court's failure to award interest on the basis of such benefit was not error.

## B. Punitive Damages

■■ Ma correctly argues that in appropriate cases punitive damages may be awarded for fraudulent inducement to contract. *See, e.g., Jeffers v. Nysse*, 98 Wis.2d 543, 297 N.W.2d 495 (1980), in which the Wisconsin Supreme Court held that "punitive damages may be awarded where a fraudulent representation is made and relied on to induce a contract in willful, wanton, or reckless disregard of the plaintiff's rights." *Id.* at 553, 297 N.W.2d 495. This proposition is not disputed by the bank. Rather, the bank points out, correctly, that under Wisconsin law, the factfinder's refusal to award punitive damages is not reviewable by an appellate court, even though such damages might be permissible. In *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 260 (1980), for example, the Wisconsin Supreme Court stated: "Even if the jury is satisfied to a reasonable certainty by evidence that is clear, satisfactory and convincing that the defendant's conduct was 'outrageous,' in Wisconsin, the jury need not award punitive damages.... The jury's refusal to award punitive damages is not reviewable." *Id.* at 301–02, 294 N.W.2d 260 (citations omitted).

■ Ma's response appears to be that the district court's ruling on punitive damages

---

**11.** However, the trial court's award of interest on the delayed interest payments at the contract rate of 5% per year, not compounded must remain standing. Ma may not receive the higher rate of interest on the withheld interest checks because the bank remitted the checks to him in May 1973, before the higher rate took effect.

is reviewable because the court did not make the ruling after trial, in its capacity as factfinder, but rather ruled, in its October 21, 1977 partial summary judgment order, that Ma was not entitled to punitive damages as a matter of law.

As described above, the district court stated in its October 21, 1977 order that "[t]he facts of this case do not show the requisite conduct necessary to sustain the award of punitive damages." We agree that the district court erred in making this premature finding of fact. The court's error, however, was not reversible. At trial, Judge Warren repeatedly allowed Ma's attorney to introduce evidence of the bank's unreasonableness and arbitrariness for the express purpose of showing that punitive damages should be awarded. After reviewing such evidence, the judge adhered to his previous conclusion that he would not award punitive damages. In practical effect, the judge's final ruling on punitive damages was made in his capacity as factfinder. The ruling is therefore not reviewable.

## C. Attorneys' Fees and Litigation Costs

■ Further, we hold that the district court did not abuse its discretion in refusing to award attorneys' fees and litigation costs. This court has held that "[e]xcept when overriding considerations of justice compel them, it is the policy of federal and state courts to deny attorneys' fees in the absence of statutory authorization or agreement." *Forest Laboratories, Inc. v. Pillsbury Co.*, 452 F.2d 621, 628 (7th Cir. 1971). Ma contends that this is a proper case for an award of attorneys' fees and litigation costs because the bank's conduct was particularly unreasonable. He relies on *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), a seaman's suit for maintenance and cure, in which the United States Supreme Court held that attorneys' fees should have been awarded as a matter of equity. The Court stated:

> In the instant case respondents were callous in their attitude, making no investigation of libellant's claim and by their

silence neither admitting nor denying it. As a result of that recalcitrance, libellant was forced to hire a lawyer and go to court to get what was plainly owed him under laws that are centuries old. The default was willful and persistent. It is difficult to imagine a clearer case of damages suffered for failure to pay maintenance than this one.

*Id.* at 530–31, 82 S.Ct. at 999–1000. Certainly, if *Vaughan* controlled this case, it would support Ma's argument that attorneys' fees and litigation expenses are recoverable here. But this case is governed not by federal admiralty law but by the law of Wisconsin, which appears to take a much stricter view of the allowability of attorneys' fees. In *Baker v. Northwestern National Casualty Co.*, 26 Wis.2d 306, 132 N.W.2d 493 (1965), the Wisconsin Supreme Court reversed a jury's award of attorneys' fees even though the Court upheld the jury's determination "that the massive failure of [the defendant insurance company] to carry out its duties . . . evidenced such a shocking disregard of its insured's interests as to constitute 'a suggestion of dishonesty' or 'a species of fraud,' within the meaning of 'bad faith.'" *Id.* at 315, 132 N.W.2d 493. In light of *Baker*, even if we were to agree with Ma that the bank's conduct was utterly lacking in good faith and reasonableness, we are constrained to conclude that he may not recover attorneys' fees or litigation costs in excess of the amount permitted by statute.

## D. Consequential Damages

We have discussed Ma's entitlement to interest as a measure of consequential damages. Ma seeks, in addition, damages for injury to his professional career, injury to his reputation, loss of living comfort and ease and emotional distress.

■ We agree with the district court that these damages are too speculative to permit Ma's recovery. First, Ma's claim of damage to his professional career is unavailing in light of *Baker v. Northwestern National Casualty Co., supra,* in which the Wisconsin Supreme Court held that lost

profits of a company to be formed in the future were too speculative. Here Ma had not yet embarked upon a professional career at the time of the bank's breach, and therefore he has no prior earnings that can be compared to his earnings subsequent to the breach. He is entitled to no recovery for this alleged loss. *Accord, M. Schultz Co. v. Gether,* 183 Wis. 491, 198 N.W. 433 (1924). Second, Ma's generalized claim that he suffered severe emotional distress is insufficient to form a basis for recovery of such damages. In Wisconsin, to recover for emotional distress damages resulting from a fraud, the plaintiff must plead and prove (1) that the defendant acted for the purpose of causing the plaintiff emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct was the cause-in-fact of the injury; and (4) that the plaintiff suffered an extreme disabling emotional response to the defendant's conduct. *D. R. W. Corporation v. Cordes,* 65 Wis.2d 303, 309, 222 N.W.2d 671 (1974). Alternatively, to recover emotional distress damages resulting from bad-faith breach of contract, the plaintiff must plead and prove "substantial damages aside and apart from the emotional distress itself and the damages occasioned by the simple breach of contract." *Anderson v. Continental Insurance Co., supra,* 85 Wis.2d 675, 696, 271 N.W.2d 368, 378 (1978). Ma failed to meet either standard of pleading and proving emotional distress damages. Finally, with regard to his claims of injury to his reputation and of loss of living comfort and ease, Ma has never made specific factual allegations or offered specific factual evidence in support of such claims. In the absence of such evidence, it is impossible to arrive at a "fair and reasonable approximation" of the losses for which Ma now seeks recovery. *See R. W. Construction, supra,* 78 Wis.2d at 469, 255 N.W.2d 293.

Ma concedes that speculative damages are not recoverable, but argues that because the district court ruled in its summary judgment order that he was not entitled to these damages, he was improperly denied the opportunity to offer specific evidence of his losses. We cannot agree. Throughout the four-day liability trial, and at the damages hearing, the court demonstrated considerable flexibility in admitting evidence that was arguably precluded under its earlier rulings. We are satisfied that had Ma sought to introduce specific evidence of his losses, the court would have permitted it. But Ma made no such offer of proof and does not, even now, assert facts to support his claim of these losses. In light of Ma's failure to introduce adequate evidence of consequential damages (other than interest), we conclude that the district court's refusal to award such damages was not error.

## II. *Dismissal of Tort Claims*

Ma contends that the district court erred in dismissing his tort claim of bad-faith breach of contract and in dismissing his tort claim of conversion. These issues are moot in light of our disposition of Ma's damage arguments. Even if he had proved both of these claims, his interest recovery would not thereby be affected. Such recovery is limited because Ma's proof of actual loss was limited, not because he was prevented from demonstrating the bank's tort liability. Nor would Ma be entitled to attorney's fees, litigation costs, or punitive damages. Such remedies depend on the nature of the wrongdoer's conduct, not on the classification of the underlying wrong as breach of contract or tort, *see Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 267, 294 N.W.2d 437 (1980). The nature of the bank's conduct was fully aired at trial and, as discussed above, the district court did not abuse its discretion in denying attorneys' fees, and we may not review the denial of punitive damages. Finally, had Ma proved his claims of bad faith and conversion, his consequential damages would still have been limited because of his failure to prove their amount.

We conclude that no reversible error resulted from the district court's dismissal of Ma's claims of bad faith and conversion.

## III. *Jury Demand*

Ma's jury demand was untimely under Federal Rule of Civil Procedure 38(b), which provides:

(b) DEMAND. Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party.

The "last pleading" was the bank's amended answer, filed May 21, 1975. Ma's jury demand was not filed until January 28, 1976. Under Rule 39(b), the district court had discretion to order trial by jury despite the untimely demand, upon Ma's motion requesting it. He filed such a motion on March 29, 1976. The decision to grant or deny the motion was committed to the sound discretion of the district court and will be overturned only for abuse of discretion. *See* 5 Moore's Federal Practice ¶ 39.-09, at 39–19 (2d ed. 1981). As a general rule, mere inadvertence will not justify relief from a waiver of the right to trial by jury; some other reason for relief must be shown. *Id.* at 39–30. Ma asserts that his delay in demanding jury trial was caused by his original attorneys and their law firm, "due to their conflict of interest in simultaneously representing Ma and the parent corporation of the Community Bank ...." Brief of Appellant at 23. But assuming such a conflict existed, it does not explain why Ma's New York counsel, who filed an amended complaint in April 1975 and could have demanded a jury trial at any time within 10 days after May 21, 1975, failed to do so. The record does not support a finding that the district court abused its discretion in denying Ma's motion for a jury trial.

IV. *Local Counsel*

Ma argues that the district court erred in applying Rule 2.04 of the Rules of the District Court of the Eastern District of Wisconsin and requiring him to obtain local counsel.[12] Rule 2.04 provides:

At any time, upon its own motion, the Court may require that a non-resident attorney obtain local counsel to assist in the conduct of the case.

Ma challenges the trial court's order on two grounds: (1) that he has a federal statutory right to appear personally and cannot be compelled to retain any attorney at all, even local counsel; and (2) that the imposition of the rule was unnecessary and unduly burdensome.

Ma's first contention raises the question of whether the district court exceeded its rulemaking authority when it promulgated rule 2.04, in light of the statutory guarantee of 28 U.S.C. § 1654 that "in all courts of the United States parties may plead and conduct their own cases personally or by counsel ...." We conclude that Rule 2.04 does not unduly infringe the rights of individual litigants to proceed *pro se* or to select counsel of their own choosing.

The Federal Rules of Civil Procedure,[13] in accordance with the Judicial Code,[14] clearly empower district courts to promulgate housekeeping rules. *See Hanna v. Plumer*, 380 U.S. 460, 475, 85 S.Ct. 1136, 1146, 14 L.Ed.2d 8 (1965) (Harlan, J., concurring); *Miner v. Atlass*, 363 U.S. 641, 80 S.Ct. 1300,

---

**12.** Ma sought our review of this question in 1976 by means of an interlocutory appeal. At that time we declined to extend the collateral order rule of *Cohen v. Beneficial Ind. Loan Corp.*, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), to permit our review of the trial court's order. *Ma v. Community Bank*, 544 F.2d 522 (7th Cir. 1976) (unpublished order). The issues raised in the interlocutory appeal have now merged into the final judgment and are appropriately raised for review.

**13.** Rule 83 of the Federal Rules of Civil Procedure provides in part:

Each district court by action of a majority of judges may from time to time make and amend rules governing its practice not inconsistent with these rules. * * * In all cases not provided for by rule, the district courts may regulate their practice in any manner not inconsistent with these rules.

**14.** 28 U.S.C. § 2071 provides:

The Supreme Court and all courts established by Act of Congress may from time to time prescribe rules for the conduct of their business. Such rules shall be consistent with Acts of Congress and rules of practice and procedure prescribed by the Supreme Court.

4 L.Ed.2d 1462 (1960), *modified in Colgrove v. Battin*, 413 U.S. 149, 163–64, 93 S.Ct. 2448, 2456, 37 L.Ed.2d 522 (1973) (federal rules shall not modify "substantive rights" or establish "basic procedural innovations"); *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941). *Cf. Rodgers v. United States Steel*, 508 F.2d 152, 163–64 (3d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975) (local rule restricting communication among putative class members held invalid); *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977) (district court's order restricting communication among putative class members held invalid). The legislative history of section 2071 of the Judicial Code illustrates that "broad rule-making power was intended." H.R.Rep.No. 308, 80th Cong., 1st Sess., at A169 (1947), *quoted in* 7 Moore's Federal Practice ¶ 38.-02, at 88–3 (2d ed. 1979); *cf. Galveston Dry Dock & Construction Co. v. Standard Dredging Co.*, 40 F.2d 442, 444 (2d Cir. 1930) (L. Hand, J.) (local rule in admiralty). Rule 2.04 is designed to facilitate the filing and service of papers with the court and to provide the court with greater flexibility in scheduling status hearings. These goals are clearly permissible regulations of the "procedure" by which claims are litigated. Nothing in Rule 2.04 requires that the services of local counsel extend beyond this essentially mechanical function. The litigant remains free to control his own case and to be represented by counsel of his own choosing. Thus, Rule 2.04 does not have any substantial adverse impact on rights conferred on litigants by section 1654 of the Judicial Code.

Ma's second argument attacks the wisdom of Judge Gordon's imposition of Rule 2.04 in this case.[15] First, Ma argues that imposition of the rule was unnecessary because there were only two incidents in which he failed timely to serve documents that he had filed with the court. One of those documents, however, was a petition for writ of mandamus, a requested form of relief that urges expedited action by the district court. Failure of timely service of such a paper, even if caused by "secretarial error," as Ma alleges, is serious. Second, Ma points out that at the time the district court ordered him to obtain local counsel, he was already represented by a New York attorney who was admitted to practice before the bar of the Eastern District of Wisconsin, though not the Wisconsin state bar, and who was quite able to continue adequately that representation. He argues that imposition of Rule 2.04 was oppressive because its necessary intent and effect was to compel him to turn over the control of his case to local counsel, to finance the education of new counsel on the nature of the case, and to incur costs and fees inevitably generated by local counsel.

Ma's objections to the requirement of local counsel are based on a fundamental misapprehension of the purpose of Rule 2.04. As noted above, Rule 2.04 is designed to facilitate mechanical service and not to deprive a plaintiff of the right to select any attorney, from whatever location he desires, to represent his case.[16] In fact, Ma acknowledges that "local counsel filed no motion papers, except her motion to withdraw, no briefs nor other legal documents . . . . [S]he did absolutely nothing in this case." Reply brief at 7. In light of these concessions, it is difficult to see how the appointment of local counsel deprived Ma of the

---

**15.** Ma also raises two arguments related to whether the terms of Rule 2.04 were satisfied. He argues, first, that Rule 2.04 empowers district courts to order nonresident *attorneys*, but not their clients, to obtain local counsel. Second, he contends that Rule 2.04 contemplates district courts acting only on their own motion and not upon the suggestion of another party. These arguments have no merit. Whether the district court's order to obtain local counsel is addressed directly to the litigant or to the litigant through his nonresident

attorney is immaterial; and a district court cannot be deprived of the power to correct abuses in service of process when a party has alerted the court to the need for corrective action.

**16.** Ma correctly recites that Wisconsin courts liberally permit *pro haec vice* appearances by out-of-state counsel. Brief of Appellant at 28–29. This proposition, however, is inapposite to a district court's considered judgment that Rule 2.04 ought to be applied.

right to control the course of his litigation. It is equally difficult to see, in light of local counsel's inactivity, how her appointment could have generated unduly burdensome fees.

We conclude that Judge Gordon did not abuse his discretion in concluding that local counsel would assist in the prosecution of the case without causing undue burdens to Ma.

### V. *Bias of the District Judge*

Ma's claim of bias on the part of Judge Warren is unsupported in the record. Adverse rulings do not show bias requiring disqualification of a trial judge. *E.g., United States v. English*, 501 F.2d 1254, 1263 (7th Cir. 1974). "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966), quoted in *English, supra*, at 1263. Ma complains that Judge Warren lived in DePere "for a while," and knew that bank attorney Morris had practiced law for a considerable time. It cannot reasonably be concluded from these bare facts that Judge Warren's disposition of the case was based on something other than what he learned during the course of the litigation.

### Conclusion

For the reasons stated above, the judgment of the district court denying Ma a recovery of interest in excess of the statutory prejudgment interest rate is reversed. Ma is entitled to recover interest on $30,000.00 at a rate of 5.5% compounded daily, for the period from July 1, 1973 to the date the bank relinquished his funds, less the interest already paid by the bank on such principal during that period. The case is remanded for the purpose of recalculating Ma's interest award. In all other respects, the district court's judgment is affirmed.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.